FILED

2005 Aug-11  AM 10:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **EDWIN L. THOMAS, as personal representative of the Estate of James Edwin Thomas, a deceased minor,** | ] ] ] ] | |
| **Plaintiff,** | ] ] | **CASE NO.:** **2:02CV2001-VEH** |
| | ] ] | |
| **v.** | ] ] | |
| **EVENFLO COMPANY, INC., et al.,** | ] ] | |
| **Defendants.** | ] | |

### Memorandum of Opinion

## I.    INTRODUCTION

This case comes before the Court on the Defendant's Motion *In Limine* to Exclude the Testimony of Gary Whitman. (Doc. 69).

This is a civil action filed by the Plaintiff, Edwin Thomas, as personal representative of the Estate of James Edwin Thomas, a deceased minor, against Evenflo Company, Inc. ("Evenflo") and Toys R' Us, Inc. ("Toys R' Us"). The case arises out of the asphyxiation of Master Thomas while restrained in his Evenflo "On My Way" five-point child restraint system ("CRS"). It is undisputed that the child was placed in the restraint system by an adult caregiver and left unattended, in the system, on the floor, in a room in the caregiver's home.

The Plaintiff has propounded as an expert witness Gary R. Whitman.  Among other things, Mr. Whitman has opined the following in his Rule 26 report:

1. James Edwin Thomas was in the subject Evenflo On-My Way with its harness adjusted on his body.

2. The subject On-My-Way with James Thomas in it was placed on the floor in the bedroom of Mary Brown's house.

3. One side of the harness became disengaged and James Thomas moved such that he had both of his legs on one side of the crotch strap.  His body slid forward causing the harness tie to load against his neck.  This loading resulted in his asphyxiation.

4. The Evenflo On-My-Way is defective and unreasonably dangerous due to its crotch strap being too long for its intended purpose of restraining the lower torso of a child of James Thomas's size.  Evenflo knew or should have known of this defect based on human subject fit studies.  There were technologically and economically feasible design alternatives for this design at the time that the subject infant carrier was manufactured.

5. The Evenflo On-My-Way is defective and unreasonably dangerous due to its crotch strap being too far forward of the seat back for its intended purpose of restraining the lower torso of a child of James Thomas's size.  Evenflo knew or should have known of this defect based on human subject fit studies.  There were technologically and economically feasible design alternatives for this design at the time the subject infant carrier was manufactured.

6. The Evenflo On-My-Way is defective and unreasonably dangerous due to its failure to provide a buckle that spring ejects the harness latch plates when the inserted latchplate is disengaged.  Evenflo knew or should have known of this hazard

through hazard analysis and/or a Failure Modes and Effects Analysis. There were technologically and economically feasible design alternatives for this design at the time that the subject infant carrier was manufactured. In fact, other buckles on the market incorporate the spring eject feature.

7.     The Evenflo On-My-Way is defective and unreasonably dangerous because its design allows the carrier to be positioned such that the infant is placed in a near upright seated position. Evenflo knew of the hazard created by placing an infant child in a near upright position but failed to minimize the potential through proper design. There were technologically and economically feasible design alternatives for this design. Other infant carriers have incorporated such features.

8.     The Evenflo On-My-Way is defective and unreasonably dangerous because it fails to incorporate an on-product warning cautioning the reader of the hazard created by placing an infant in a near upright seated position. Evenflo knew of the hazard created by placing an infant child in a near upright position, but failed to minimize the potential through proper design and warning.

9.     The Evenflo On-My-Way is defective and unreasonably dangerous because its design fails to incorporate an angle indicator on the carrier to inform the installer when an acceptable reclination angle has been achieved. Evenflo's recognition of the need for such an indicator is demonstrated by the reclination indicator provided on the base. However, it is reasonable, foreseeable, and in accordance with the instructions to use the carrier both in and out of the car without the base. There were technologically and economically feasible design alternatives for this design at the time that the subject infant carrier was manufactured.

*Whitman Letter of July 1, 2003*, at 9-10.

3

The Defendants previously sought to strike the opinions of Mr. Whitman in a Motion in Limine which was denied, without prejudice, by this Court, on March 15, 2005.  The renewed motion is presently before the Court.

## II.    STANDARD FOR REVIEWING EXPERT TESTIMONY

In evaluating expert testimony, the Eleventh Circuit Court of Appeals has outlined the following analysis:

> The starting point for our analysis is Rule 702 of the Federal Rules of Evidence, which controls the admission of expert testimony. It provides:
>
>> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
>
> As the Supreme Court made abundantly clear in Daubert, Rule 702 compels the district courts to perform the critical "gatekeeping" function concerning the admissibility of expert scientific evidence. 509 U.S. at 589 n. 7, 597, 113 S.Ct. at 2795 n. 7, 2798. The trial courts are also required to play the same gatekeeping function considering the admissibility of technical expert evidence. Kumho Tire, 526 U.S. at 147, 119 S.Ct. at 1174. This function "inherently require[s] the trial court to conduct an exacting analysis" of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702. McCorvey, 298 F.3d at 1257.
>
> The importance of Daubert 's gatekeeping requirement cannot be

overstated. As the Supreme Court framed it in Kumho Tire: "[T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. at 152, 119 S.Ct. at 1176. The district court's role is especially significant since the expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." Daubert, 509 U.S. at 595, 113 S.Ct. at 2798 (quoting Jack B. Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991) ("Weinstein")). Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible hearsay if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.R.Evid. 703.

Thus, it comes as no surprise that in determining the admissibility of expert testimony under Rule 702, we engage in a rigorous three-part inquiry. Trial courts must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir.1998) (citing Daubert, 509 U.S. at 589, 113 S.Ct. at 2794). While there is inevitably some overlap among the basic requirements--qualification, reliability, and helpfulness--they remain distinct concepts and the courts must take care not to conflate them. Quiet Tech., 326 F.3d at 1341.

The proponent of expert testimony always bears "the burden to show that his expert is 'qualified to testify competently regarding the matters he intend [ed] to address; [ ] the methodology by which the expert reach[ed] his conclusions is sufficiently reliable; and [ ] the testimony assists the trier of fact.' " McCorvey, 298 F.3d 1253, 1257 (alterations in original) (quoting Maiz, 253 F.3d at 664). The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or the defendant in a civil suit, or the government or the accused in a criminal case.

Turning first to the qualification of the expert, we observe that experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status. In fact, the plain language of Rule 702 makes this clear: expert status may be based on "knowledge, skill, experience, training, or education." (emphasis added). The Committee Note to the 2000 Amendments of Rule 702 also explains that "[n]othing in this amendment is intended to suggest that experience alone ... may not provide a sufficient foundation for expert testimony." Fed.R.Evid. 702 advisory committee's note (2000 amends.).

Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express. As we observed in Quiet Technology, "while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability.... [O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." 326 F.3d at 1341-42. Quite simply, under Rule 702, the reliability criterion remains a discrete, independent, and important requirement for admissibility.

Indeed, the Committee Note to the 2000 Amendments of Rule 702 expressly says that, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the

opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.' " Fed.R.Evid. 702 advisory committee's note (2000 amends.) (emphasis added); see also Daubert v. Merrell Dow Pharmaceuticals, Inc. (on remand), 43 F.3d 1311, 1316 (9th Cir.1995) (observing that the gatekeeping role requires a district court to make a reliability inquiry, and that "the expert's bald assurance of validity is not enough"). If admissibility could be established merely by the ipse dixit of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.

Thus, it remains a basic foundation for admissibility that "[p]roposed [expert] testimony must be supported by appropriate validation-- i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590, 113 S.Ct. at 2795. As the Supreme Court put it, "the Rules of Evidence-- especially Rule 702--... assign to the trial judge the task of ensuring that an expert's testimony ... rests on a reliable foundation." Id. at 597, 113 S.Ct. at 2799.

When evaluating the reliability of scientific expert opinion, the trial judge must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592-93, 113 S.Ct. at 2796. To evaluate the reliability of scientific expert opinion, we consider, to the extent practicable:

> (1) whether the expert's theory can be and has been tested;
> (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

Quiet Tech., 326 F.3d at 1341 (citing McCorvey, 298 F.3d at 1256 (citing Daubert, 509 U.S. at 593-94, 113 S.Ct. at 2796-97)).

These factors are illustrative, not exhaustive; not all of them will

apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion. See Kumho Tire, 526 U.S. at 150- 152, 119 S.Ct. at 1175-76; Fed.R.Evid. 702 advisory committee's note (2000 amends.); see also Heller v. Shaw Indus., Inc., 167 F.3d 146, 155 (3d Cir.1999) ("[N]ot only must each stage of the expert's testimony be reliable, but each stage must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules.").

The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony. Kumho Tire, 526 U.S. at 152, 119 S.Ct. at 1176; see also Clark v. Takata Corp., 192 F.3d 750, 758 (7th Cir.1999) ("In determining whether an expert's testimony is reliable, the Daubert factors are applicable in cases where an expert eschews reliance on any rigorous methodology and instead purports to base his opinion merely on 'experience' or 'training.' "). As the Supreme Court explained in Kumho Tire:

> In certain cases, it will be appropriate for the trial judge to ask, for example, how often an engineering expert's experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant engineering community. Likewise, it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.

526 U.S. at 151, 119 S.Ct. at 1176. Sometimes the specific Daubert factors will aid in determining reliability; sometimes other questions may be more useful. As a result, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Id. at 152, 119 S.Ct. at 1176. Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate

the reliability of the testimony before allowing its admission at trial. See Fed.R.Evid. 702 advisory committee's note (2000 amends.) ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." (emphasis added)).

The final requirement for admissibility of expert testimony under Rule 702 is that it assist the trier of fact. By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. See United States v. Rouco, 765 F.2d 983, 995 (11th Cir.1985) (expert testimony admissible if it offers something "beyond the understanding and experience of the average citizen"). Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. See 4 Weinstein's Federal Evidence § 702.03[2] [a].

Because of the powerful and potentially misleading effect of expert evidence, see Daubert, 509 U.S. at 595, 113 S.Ct. at 2798, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403. Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, see Rouco, 765 F.2d at 995, or if the expert testimony is cumulative or needlessly time consuming. See, e.g., Hull v. Merck & Co., Inc., 758 F.2d 1474, 1477 (11th Cir.1985) (per curiam) (finding that admission of speculative and "potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed.R.Evid. 702"); see also United States v. Stevens, 935 F.2d 1380, 1399 (3d Cir.1991) (finding expert testimony properly excluded because its probative value was outweighed by concerns of "undue delay, waste of time, or needless presentation of cumulative evidence"). Indeed, "the judge in weighing possible prejudice against probative force under Rule 403 ... exercises more control over experts than over lay witnesses." Weinstein, 138 F.R.D. at 632; see also Salem v. U.S. Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). Simply put, expert testimony may be assigned talismanic significance in the eyes of

9

lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.

*U.S. v. Frazier,* 387 F.3d 1244, 1259 -1263 (11th Cir. 2004) (footnotes omitted).

## III.   ANALYSIS

### A.   Whitman's Qualifications

The Defendants first argue that Mr. Whitman is not qualified to render the opinions in his Rule 26 report.  The Defendants offer no binding case law on point regarding what factors this Court should consider when determining whether Mr. Whitman is qualified.  Instead they pick several non-binding District Court decisions which they contend outline the framework of what courts consider when determining whether an expert is qualified.

After careful review, this Court has found no Eleventh Circuit case which lays out in detail the type of framework which the Defendants cite.  "*Daubert* itself stresses that "[t]he inquiry envisioned by Rule 702 is ... a flexible one." *Id.* at 594, 113 S.Ct. at 2797. "Many factors will bear on the inquiry, and [there is no] definitive checklist or test." *Id.* at 593, 113 S.Ct. at 2796." *Maiz v. Virani,* 253 F.3d 641, 665 (11th Cir. 2001).

The Court's own review has discovered that, generally, the standard for qualifying expert witnesses is liberal. *See, e.g. In re Paoli R.R. Yard PCB Litig.,* 916

F.2d 829, 855 (3d Cir. 1990); *U.S. v. Barker*, 553 F.2d 1013, 1024 (6th Cir. 1977); *Thomas v. Newton Int'l Enterprises, Inc.*, 42 F.3d 1266, 1269 (9th Cir. 1994); *Gardner v. General Motors Corp.,* 507 F.2d 525, 528 (10th Cir. 1974); *see also, Collins By and Through Kay v. Seaboard Coast Line R. Co.,* 675 F.2d 1185, 1194 (11th Cir. 1982) (recognizing Eleventh Circuits "liberal construction" of Rule 702).  A witness may be qualified as an expert if he possesses a specialized knowledge, skill, experience, training, or education.  *Fed. R. Evid.* 702.  Thus, it is an abuse of discretion for a trial court to exclude expert testimony solely on the ground that the witness is not qualified to render the opinion at issue because the witness lacks a certain educational or other experiential background.  *See Poulis-Minott v. Smith*, 388 F.3d 354, 360 (1st Cir. 2004); *see e.g. McCullock v. H.B. Fuller Co.* , 61 F.3d 1038, 1042 (2d Cir. 1995); *In re Paoli R.R. Yard PCB Litig.,* 916 F.2d 829, 855 (3d Cir. 1990); *Dickenson v. Cardiac and Thoracic Surgery of E. Tennessee*, 388 F.3d 976, 980-982 (6th Cir. 2004).  Similarly, it is an abuse of discretion for a trial court to exclude expert testimony solely on the ground that the witness is not qualified to render an opinion because the witness lacks expertise in specialized areas that are directly pertinent to the issues in question, if the witness has educational and experiential qualifications in a general field related to the subject matter of the issue in question.  *See e.g. Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (plaintiff's economics expert was

11

qualified to offer opinion regarding plaintiff's lost value damages arising from a real estate investment scheme, because calculating economic loses resulting from defendants' conduct was sufficiently within his expertise; his lack of experience in real estate development and resulting ignorance about how pilfered funds would have been invested went to foundation for expert's testimony, not to his qualifications).

On the other hand, if a proffered witness's qualifications are lacking, the trial Court should exclude that witnesses as unqualified. *See e.g. United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999) (proposed expert witness's background did not qualify him as expert, and trial court did not abuse discretion by excluding his testimony). In *Paul*, the Eleventh Circuit keyed on several factors to determine that the attorney proffered was not qualified as a handwriting expert. The Court wrote:

> The record reflects that Denbeaux had no skill, experience, training or education in the field of handwriting analysis. The record shows that Denbeaux has a law degree and that he is a law professor who teaches evidence. Before 1989, he reviewed the literature in the field of questioned document examinations, and then coauthored a law review article critical of forensic document examiners' ability to reach the correct conclusion in questioned document examinations. *See* D. Michael Risinger, Mark Denbeaux and Michael J. Saks, *Exorcism of Ignorance as a Proxy for Rational Knowledge: The Lessons of Handwriting Identification Expertise,* 137 U. Pa. L. Rev. 731 (1989). His skill, experience, training and education as a lawyer did not make him any more qualified to testify as an expert on handwriting analysis than a lay person who read the same articles.
>
> At the time of the trial, Denbeaux had done virtually no further research

12

or writing on the subject of the reliability of handwriting expertise since the University of Pennsylvania published his law review article in 1989. During cross-examination, he admitted that he was not a questioned documents examiner, had received no formal training in the field, had never attended seminars on handwriting analysis, had never worked in a questioned documents laboratory and was not a member of any professional organizations in the field. Further, because Denbeaux was not an expert on the limitations of handwriting analysis, the district court's exclusion of his testimony did not prejudice Paul. Denbeaux's background did not qualify him as an expert, and his knowledge of the subject matter is so limited that it was not an abuse of discretion for the district court to exclude his testimony under Rule 702.

*U.S. v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999).

Still, only one of the five bases for qualifying a witness should be enough.  The

Eleventh Circuit has held:

we observe that experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status. In fact, the plain language of Rule 702 makes this clear: expert status may be based on "knowledge, skill, *experience,* training, or education." (emphasis added). The Committee Note to the 2000 Amendments of Rule 702 also explains that "[n]othing in this amendment is intended to suggest that experience alone ... may not provide a sufficient foundation for expert testimony." Fed.R.Evid. 702 advisory committee's note (2000 amends.).

*U.S. v. Frazier*, 387 F.3d 1244, 1260 -1261 (11th Cir. 2004) (emphasis in original).

The Court having completed this review, it rejects the implication by the

Defendants that it *must* follow the factors the Defendants have laid out in order to

find that Mr. Whitman is not qualified. Instead, it will address Mr. Whitman's

13

qualifications as a whole to determine if he is qualified to make the statements in his Rule 26 report.

Gary Whitman is presently employed as the Group Manager of Research and Development for an engineering firm known as ARCCA, Inc. *Professional Biographical Outline of Gary R. Whitman*, at 2.  Mr. Whitman is employed as an engineering consultant in the fields of occupant crash protection, crash safety, crash survival, emergency escape, life support engineering, the design of child safety seats, and the design of vehicle seat and restraint systems. *Id.* Whitman possesses a Bachelor of Science Degree in mechanical engineering from Drexel University in 1979. *Id.* Since obtaining his undergraduate degree, Whitman has completed post-graduate work in Medical Science I, II, and III . *Id.* at 1-2.  In addition, Whitman has completed courses in anatomy and physiology.  *Id.* at 2.

Prior to his employment with ARCCA, Whitman was a civilian employed by the United States Navy to provide consultation and other engineering-related services. *Id.*  Whitman led a technical engineering team while working with the design, development, testing, and evaluation of advanced pilot and crew restraint systems for Navy aircraft (including seats and seat belts).  *Id.*; *Whitman Depo.*, at 17-29.

Whitman is a  member of the Society of Automotive Engineers (SAE). *Professional Biographical Outline of Gary R. Whitman*, at 1.

14

Whitman has authored (and co-authored) a number of peer reviewed publications concerning occupant seating and restraint systems, including child restraint systems. *Id.* at 3-5.

Whitman is co-holder of two patents dealing with occupant crash protection systems for motor vehicles. *United States Patent No. 6,155,601 and 5,553,924.*

Whitman has conducted at least one program involving the design of child safety seats and crash protection that was funded by the federal government through the National Highway Traffic and Safety Administration (NHTSA).  NHTSA funded a study directed by Whitman regarding the biofidelity of the Hybrid III three-year-old child test crash dummy during sled testing and its ability to accurately predict the injuries to children in real world crashes. *Professional Biographical Outline of Gary R. Whitman*, at 1; *Gary Whitman*, *A Method for the Assessment of Tethered and Untethered Child Restraint Systems Using the Hybrid III Three Year Old Dummy (Abstract).*

Whitman has been consulted by the Partners for Child Passenger Safety of The Children's Hospital of Philadelphia (CHOP) and the American Academy of Pediatrics (AAP) on child safety seat design, and child restraint research. *Professional Biographical Outline of Gary R. Whitman*, at 1; *Whitman Depo.* at 100-101.

Whitman received the Pennsylvania Governor's Highway Safety Award for

15

Occupant Protection in 1997. *Professional Biographical Outline of Gary R. Whitman*, at 1.

Based on the review of the evidence, this is not the situation noted in the *Paul* case where Mr. Whitman is no more qualified than a lay witness to render his opinions. While the Court is well aware of its "gatekeeper" role:

> A district court's gatekeeper role under *Daubert* "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan,* 184 F.3d 1300, 1311 (11th Cir.1999). " 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence.' " *Id.* (quoting *Daubert,* 509 U.S. at 596, 113 S.Ct. at 2786).

*Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001).

The Court is convinced that Mr. Whitman has sufficient knowledge, skill, experience, training, or education to render each of the opinions in his Rule 26 report. Accordingly, Mr. Whitman is qualified.

**B.    Whether the Methodology By Which Whitman Reaches His Conclusions Is Sufficiently Reliable As Determined By the Sort of Inquiry Mandated in *Daubert*.**

When evaluating the reliability of scientific expert opinion, the trial judge must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592-93, 113 S.Ct. at 2796. To evaluate the reliability of scientific expert opinion, we consider, to the extent practicable:

> (1) whether the expert's theory can be and has been tested;
> (2) whether the theory has been subjected to peer review
> and publication; (3) the known or potential rate of error of
> the particular scientific technique; and (4) whether the
> technique is generally accepted in the scientific
> community.

Quiet Tech., 326 F.3d at 1341 (citing McCorvey, 298 F.3d at 1256 (citing Daubert, 509 U.S. at 593-94, 113 S.Ct. at 2796-97)).

> These factors are illustrative, not exhaustive; not all of them will apply
> in every case, and in some cases other factors will be equally important
> in evaluating the reliability of proffered expert opinion. See Kumho
> Tire, 526 U.S. at 150- 152, 119 S.Ct. at 1175-76; Fed.R.Evid. 702
> advisory committee's note (2000 amends.); see also Heller v. Shaw
> Indus., Inc., 167 F.3d 146, 155 (3d Cir.1999) ("[N]ot only must each
> stage of the expert's testimony be reliable, but each stage must be
> evaluated practically and flexibly without bright-line exclusionary (or
> inclusionary) rules.").

*U.S. v. Frazier,* 387 F.3d 1244, 1259 -1263 (11th Cir. 2004) (footnotes omitted).

The Court will examine each opinion separately.

## 1.    Statement 1.

*"James Edwin Thomas was in the subject Evenflo On-My-Way with its harness adjusted on his body."*

This is not an expert opinion but a purported statement of fact.  Mr. Whitman is not a fact witness who can testify the information contained in this statement.  However, the information contained in this statement is undisputed and has been relied upon by all parties and experts in this case.  The statement is reliable.

### 2.   Statement 2.

*"The subject On-My-Way with James Thomas in it was placed on the floor in the bedroom of Mary Brown's house."*

For the reasons stated above, this statement also is reliable.

### 3.   Statement 3.

*"One side of the harness became disengaged and James Thomas moved such that he had both of his legs on one side of the crotch strap. His body slid forward causing the harness tie to load against his neck. This loading resulted in his asphyxiation."*

The Defendant states that this statement is unreliable because

Whitman has cited no studies, tests, or publications on infant movement within a stationary CRS to support his theory and has not provided a known rate of error or basis to demonstrate that his methodology is generally accepted. Most critically, the testing Whitman performed to reach his conclusion did not represent the accident situation or the size of the decedent.

*Defendant's Brief*, at 19.

The Plaintiff responds to these allegations by citing the Court to "Whitman's file" which he claims

consists of all depositions of fact witnesses, notes, measurements and photographs of two surrogate fit checks, photographs and measurements of weighed dummy fit checks, peer reviewed articles supporting his methodology, medical records, medical examiner records and photographs, blue prints and drawings of the subject seat and numerous other items that painstakingly document his support for his well reasoned opinions.

18

*Plaintiff's Brief*, at 21 (citing Plaintiff's Exhibit L, at 2).  None of these items exist at the cited location.

The Plaintiff also insists that Whitman's opinion has been "peer reviewed and is accepted in the engineering community." *Plaintiff's Brief*, at 21 (citing Plaintiff's Exhibit N, at 150).  Exhibit N is merely an article authored in part by Whitman.  The Plaintiff contends in his brief that Whitman followed the "scientific approach" set out in his brief at pages 22 and 23, and at page 150 of Whitman's article, but provides no evidentiary support for same.  In other words, while the Plaintiff establishes that there was a scientific approach that could have been used, the Plaintiff cites no evidence that establishes that Whitman used it.   Because of that, it is impossible to establish the known or potential rate of error of the particular scientific technique; and whether the technique is generally accepted in the scientific community.

The Plaintiff also notes that Whitman used another methodology in analyzing all other possible scenarios for the cause of James Edwin Thomas getting into the position that caused his death. *Plaintiff's Brief*, at 24.  However, again, the Plaintiff offers no citation to the record for this assertion.

As the Court stated when it afforded the parties a second opportunity to brief this matter, "[t]he failure of the Plaintiff to respond to a section of Defendants' brief, or to cite to evidence in support of the Plaintiff's position, will be deemed by this

Court to be a forfeiting of that issue by the Plaintiff." *Order of March 15, 2005*, at 9. Even if the Court gives the Plaintiff the benefit of the doubt, there is no evidence that Mr. Whitman has adopted any of the methodologies that the Plaintiff proposes for this opinion.

In short, the Plaintiff has pointed to no specific methodology used by Whitman. Even assuming the Plaintiff has done so, the Plaintiff cites no evidence of said methodology's known rate of error or a basis for determining if the method is generally accepted . Statement 3 will be **STRUCK**.

     4.    **Statements 4 and 5.**

*Statement 4*

*"The Evenflo On-My-Way is defective and unreasonably dangerous due to its crotch strap being too long for its intended purpose of restraining the lower torso of a child of James Thomas's size. Evenflo knew or should have known of this defect based on human subject fit studies. There were technologically and economically feasible design alternatives for this design at the time that the subject infant carrier was manufactured."*

*Statement 5*

*"The Evenflo On-My-Way is defective and unreasonably dangerous due to its crotch strap being too far forward of the seat back for its intended purpose of restraining the lower torso of a child of James Thomas's size. Evenflo knew or should have known of this defect based on human subject fit studies. There were technologically and economically feasible design alternatives for this design at the time the subject infant carrier was manufactured."*

Whitman performed two tests using three different CRSs, an exemplar of the CRS at issue in this case, an Evenflo Cozy Carry, and a CRS manufactured by Graco, and three different children.   *Whitman Depo.*, at 111-115.   Based on these tests, Whitman concluded that a 3½ inch slot along with a shorter crotch strap would have prevented the death of Master Thomas.   *Whitman Deposition*, at 109.

In his first set of tests performed on June 12, 2003, Whitman placed an eighteen pound child into the exemplar "On-My-Way" CRS and:

A.   . . . unlatched one latch plate and detached that and found that with the harness snug that the leg could be moved from one side of the crotch strap to the other.

                                    * * *

Q.   And what were you able to determine from that?

A.   That we were able to take the child's leg and pull it up far enough that it could move from one side of the crotch strap to the other.

Q.   You actually manipulated the child's leg?

A.   That's correct.   The child didn't voluntarily do that.

*Whitman Deposition*, at 111-12, 116-17.

Whitman did not take any pictures or videotape this aspect of his tests:

Q.   Do you have any pictures of it where you actually disengaged it

21

and tried to maneuver the child's leg over to the other side?

A.    No, I don't think I took any shots as I attempted to move the leg.

Q.   Why not?   It seems to me that's the heart of the test, isn't it.

A.    I agree that probably would have been a good shot to shoot.

*Whitman Deposition*, at 122.

Whitman relied upon his own subjective beliefs in forming his opinion that the tests demonstrated how the allegedly defective crotch strap allowed the decedent to be asphyxiated:

Q.    All right.   To be clear on the On My Way test, with all of the buckles engaged in the latch plate, you were unable to maneuver this child's leg over to one side of the crotch strap?

A.    That's correct.

Q.    But with one of the latch plate - - excuse me, one of the shoulder straps disengaged from the latch plate, you were able to take the child's leg and somehow maneuver it over to the side?

A.    I maneuvered it to approximately where the crotch strap was **to satisfy myself that the child could do it**.   I didn't go any further than that because I did not want to create discomfort for the child.

Q.   I don't follow what you said.

22

A.    I took one of the knees and brought it up towards the child's chest.

Q.    Bent the knee?

A.    And bent the hip and was able to bring the leg up far enough that the leg would be behind the crotch strap, which at that point **it was** obvious **the child would then move it to the other side of the crotch strap**.

Q.    But all of this is with your assistance?

A.    It is . . .

*Whitman Deposition*, at 124-25. (Emphasis added).

The Plaintiffs insist that this test could easily be reproduced because "[a]s part of Whitman's fit check methodology, and as performed in countless fit checks Whitman has completed over the past twenty years, he carefully documented the size of the child surrogates, the make and models of infant seats used, took photographs of the fit study, and documented his observations." *Plaintiff's Brief* at 30.  However, all of the documentation to the first fit study is contained in Exhibits 15 and 16 to Mr. Whitman's deposition.  As previously noted, the most crucial parts of the first fit study were not fully documented.  In these exhibits there are no pictures or videos of the moving of the legs.  Also, there are no measurements of same either in degrees, or lengths, or otherwise.  With the information provided by Plaintiff, it is impossible

to tell exactly (to within reasonable measurements) how the child's leg was moved.

Whitman admitted during deposition that the purpose of his testing on the exemplar "On-My-Way" CRS and the two other restraint systems was to satisfy his own subjective belief that the crotch strap was too long and contributed to Master Thomas's death. *Whitman Deposition*, at 134 ["it was done to convince me that it could be done by a child . . . **And I convinced myself that was the case**."]; *Id.* at p. 137 ["And in this test, what **I was trying to do was convince myself of what could be done**."]   However, Whitman failed to videotape or photograph the manipulation of the child so that it could be exactly replicated by another expert or even shown to the jury. *Whitman Deposition*, at 136, 145-46.

It is undisputed that Whitman never moved both legs to one side of the crotch strap.  Therefore, the test was never "finished".  Whitman *assumed* the child could, on his own, continue to move the leg beyond the point where Whitman stopped manipulating it.  There is no objective evidence or test results that any child could do so.

The Plaintiff insists that Evenflo should not be able to challenge the fit tests used in this case because its own engineers have said that they felt none was necessary in order to reach a decision on defectiveness.  However, such an argument misses the mark.  Despite Evenflo's engineers' opinion, the Plaintiff's expert bases

*his* opinion on such a fit test. Therefore, criticism of the method of fit test used by Mr. Whitman is fair game.

Neither does the Plaintiff hit the mark by arguing that despite the methods used by its expert, Defendant's experts have used the same methods. While such an argument may provide support for the use of fit checks in general, it is the method of fit check that the Defendant, and ultimately the Court, finds fault with in this case. There is no evidence that *Defendant's* expert manipulated the legs of surrogates as Mr. Whitman did.

Based on the lack on documentation of the actual movement of the leg in this case, the court is convinced that statements 4 and 5 should be **STRUCK**. There is no evidence that the methods used to arrive at the conclusions have been tested, and it is clear that they cannot be recreated and therefore further tested. In addition, the tests do not prove that an event would occur, only that they *could* occur. To that end it is unclear what, it anything, the tests actually prove. There is also no evidence of peer review of the method of fit check used by Mr. Whitman in this case.

Whitman's opinion that the distance from the crotch strap to the seat bite should be shortened conflicts with the American Academy of Pediatrics' recommendations. *Whitman Depo.*, at 103-108. Where an expert's opinion conflicts with an industry standard, is not based on generally accepted methodology, or on any

methodology that has been subject to peer review, it is not reliable and is due to be excluded. *See e.g. Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001).

Statements 4 and 5 will be **STRUCK**.

### 5.    Statement 7.

*"The Evenflo On-My-Way is defective and unreasonably dangerous because its design allows the carrier to be positioned such that the infant is placed in a near upright seated position. Evenflo knew of the hazard created by placing an infant child in a near upright position but failed to minimize the potential through proper design. There were technologically and economically feasible design alternatives for this design. Other infant carriers have incorporated such features."*

It is undisputed that Whitman tested the On-My-Way design in this case to determine whether the seat could be propped up by the handle with a child in the seat. *Whitman Depo.*, at 132-135. Whitman used a weighted dummy of nearly the same weight as the decedent and placed it into the seat with the handle rotated back past the second detent. *Id.* at 59-61, 132-135.

The Plaintiff cites to no notes, testing protocols, or forces applied during the test. Once again, there is no citation showing that the theory has been subjected to peer review and publication, the known or potential rate of error of the particular scientific technique, and whether the technique is generally accepted in the scientific community. It is impossible to know whether the expert's theory can be tested

because there is no data regarding the test to allow it to recreated.  The Plaintiff, again, has not responded to this specific argument of the Defendant.

The Plaintiff merely cites the testimony of Defendant's experts which it contends is an admission of liability.  Statement 7 will be **STRUCK**.

### 6.    Statement 8.

*"The Evenflo On-My-Way is defective and unreasonably dangerous because it fails to incorporate an on-product warning cautioning the reader of the hazard created by placing an infant in a near upright seated position.  Evenflo knew of the hazard created by placing an infant child in a near upright position, but failed to minimize the potential through proper design and warning."*

The Defendant argues that this opinion is not reliable because Whitman followed no "generally accepted" methodology in determining that the Evenflo warnings were defective.  The Plaintiff states that the Defendant has mischaracterized the opinion of Whitman.  The Plaintiff contends that Whitman's opinion is not one of *adequacy* of warning, but instead of *lack of* warning and therefore the methodology for *inadequate* warning does not apply.

The Plaintiff's argument fails to consider the express wording of the statement that the carrier is unreasonably dangerous *"because it fails to incorporate an on-product warning cautioning the reader of the hazard created by placing an infant in a near upright seated position"*.  This Court sees no distinction between complaining

of the lack of a warning of a specific danger and complaining of an inadequate warning of a specific danger.  In both cases the Defendant is charged with the same responsibility in tort for "failure to warn".  Accordingly, it seems fair to hold the Plaintiff's expert to the same standard and methodology in both cases.  Notably, the Plaintiff can cite no authority for the proposition that its expert's opinion should be treated differently.

Whitman, in depositions, was asked the following:

Q.   Isn't it fundamental in the warnings community that you want to give a warning that you think will be read and heeded by the population in general?

A.   Yes, so I would agree that a human factors person, who designs the detailed warning to make sure it's the right color and font and wording that's going to attract attention and psychologically be a warning that is effective as possible, would need to be designed and tested in order to be introduced.  I am only saying that such a warning should be provided.

*Whitman Depo.*, at 182-183.  Whitman acknowledges that certain testing and a certain methodology would need to be done in this case, which has not been done. The Plaintiff admits that Whitman is not a human factors expert.  Whitman offers no example of the type of warning that he would propose in this case.  Statement 8 will be **STRUCK**.

7.     **Statement 9.**

28

> *"The Evenflo On-My-Way is defective and unreasonably dangerous because its design fails to incorporate an angle indicator on the carrier to inform the installer when an acceptable reclination angle has been achieved. Evenflo's recognition of the need for such an indicator is demonstrated by the reclination indicator provided on the base. However, it is reasonable, foreseeable, and in accordance with the instructions to use the carrier both in and out of the car without the base. There were technologically and economically feasible design alternatives for this design at the time that the subject infant carrier was manufactured."*

The Plaintiff offers no citation for its assertion that "[t]he use of angle indicators is already an accepted practice in the industry and angle indicators have been used on infant seats for more than ten years to provide the necessary information regarding proper reclination of the infant seat within the vehicle." *Plaintiff's Brief*, at 43. Whitman could not identify one single CRS manufacturer that places an angle indicator on both the base and the carrier. *Whitman Depo.*, at 215. Further, there is no evidence that Whitman has prepared a model of the alternative design, done testing of the alternative design to show that it is safer or more feasible, or has even drafted a proposed alternative design. Thus, his opinion amounts to nothing more than a "bare assertion" and will be **STRUCK**.

**C.    Whether the Opinion Assists the Trier of Fact**

**1.    Statements 1 and 2.**

*Statement 1*

*"James Edwin Thomas was in the subject Evenflo On-My Way with its harness adjusted on his body."*

*Statement 2*

*"The subject On-My-Way with James Thomas in it was placed on the floor in the bedroom of Mary Brown's house."*

These statements will assist the trier of fact, but are not normally expert opinions. However, for the reasons noted above, they will be **ALLOWED**.

### 2.    Statements 4 and 5.

*Statement 4*

*"The Evenflo On-My-Way is defective and unreasonably dangerous due to its crotch strap being too long for its intended purpose of restraining the lower torso of a child of James Thomas's size. Evenflo knew or should have known of this defect based on human subject fit studies. There were technologically and economically feasible design alternatives for this design at the time that the subject infant carrier was manufactured."*

*Statement 5*

*"The Evenflo On-My-Way is defective and unreasonably dangerous due to its crotch strap being too far forward of the seat back for its intended purpose of restraining the lower torso of a child of James Thomas's size. Evenflo knew or should have known of this defect based on human subject fit studies. There were technologically and economically feasible design alternatives for this design at the time the subject infant carrier was manufactured."*

Even if these statements were not struck as unreliable, they would be due to be

30

struck as not assisting the trier of fact.  As noted above, the tests performed were not performed to completion.  To the extent the tests prove anything, they prove not that an event would occur, only that it *could* occur.  The Court is even unsure if the tests show that much.  Whitman admits he never actually maneuvered a surrogate's legs into the proper position.  To that end  it is unclear what, if anything, the tests actually prove.  These opinions would only serve to confuse the trier of fact and are therefore due to be **STRUCK**.

### 3.      Statement 6.

> *"The Evenflo On-My-Way is defective and unreasonably dangerous due to its failure to provide a buckle that spring ejects the harness latch plates when the inserted latchplate is disengaged.  Evenflo knew or should have known of this hazard through hazard analysis and/or a Failure Modes and Effects Analysis.  There were technologically and economically feasible design alternatives for this design at the time that the subject infant carrier was manufactured.  In fact, other buckles on the market incorporate the spring eject feature."*

Whitman testified that the buckle at issue complied in all respects with Federal Motor Vehicle Safety Standard 213.  *Whitman Depo.,* at 161.  He also testified that the buckle functioned properly when he tested it.  *Id.* at 43.  Mary Brown (the caregiver) testified that, when she placed Master Thomas into the system, she had no trouble with the buckling system, she engaged the system, it seemed to work properly for her, and she "heard it [the buckle] click two times like it's going in the way it's

supposed to go." *Brown Depo.*, at 28, 47-48.

Thus the evidence indicates that the buckle complied with federal safety standards, functioned properly, and was operated correctly at the time of the accident. Evidence of a defective design would therefore be irrelevant and only confuse the jury, not aide it. The Court holds that this opinion would not assist the trier of fact and therefore will be **STRUCK**.

### 4. Statement 7.

*"The Evenflo On-My-Way is defective and unreasonably dangerous because its design allows the carrier to be positioned such that the infant is placed in a near upright seated position. Evenflo knew of the hazard created by placing an infant child in a near upright position but failed to minimize the potential through proper design. There were technologically and economically feasible design alternatives for this design. Other infant carriers have incorporated such features."*

Even if Statement 7 was not already due to be struck, it would be struck because the dummy used by Whitman in this test was 25 inches long, while Master Thomas was 28 inches long. *Whitman Depo.*, at 61. The dummy weighed 18 pounds while Master Thomas weighed 17 pounds. *Whitman Depo.,* at 61. In his deposition, Whitman admitted that the limit for the subject CRS was 26 inches, which would have meant that Master Thomas was over the recommended limit. Still, however, Whitman used a dummy below the limit, and much shorter than Master Thomas, in his tests.

Because the testing was admittedly done with a dummy of the wrong size and weight, any results obtained therefrom could not assist the trier of fact. Statement 7 is due to be **STRUCK**.[1]

### 5. Statement 8.

*"The Evenflo On-My-Way is defective and unreasonably dangerous because it fails to incorporate an on-product warning cautioning the reader of the hazard created by placing an infant in a near upright seated position. Evenflo knew of the hazard created by placing an infant child in a near upright position, but failed to minimize the potential through proper design and warning."*

Whitman admitted in deposition that he could not say with any degree of certainty whether the caregiver would have heeded any warnings placed on the CRS and that he had not done any testing regarding same. *Whitman Depo.*, at 182-183. Accordingly, any opinions as to whether warnings were needed will not assist the trier of fact and are due to be **STRUCK**.

### 6. Statement 9.

*"The Evenflo On-My-Way is defective and unreasonably dangerous because its design fails to incorporate an angle indicator on the carrier to inform the installer when an acceptable reclination angle has been achieved. Evenflo's recognition of the need for such an indicator is demonstrated by the reclination indicator provided on the base. However, it is reasonable, foreseeable, and in accordance with the instructions to use the carrier both in and out of the car without the*

---

[1]The Plaintiff's only response to this argument is that Rule 702 does not require them to place a live child into an admittedly dangerous seat position. *See Plaintiff's Brief*, at 38.

*base.  There were technologically and economically feasible design alternatives for this design at the time that the subject infant carrier was manufactured."*

This statement will not assist the trier of fact.  Whitman has made nothing more than bare assertions regarding the angle indicator, with no showing that an angle indicator on the seat would be a safer design, or would have prevented the accident. Accordingly, this statement is due to be **STRUCK**.

## IV.   CONCLUSION

For the reasons stated herein, statements 3-9 of Whitman's Rule 26 expert report will be **STRUCK**.  Gary Whitman shall be **PRECLUDED** from rendering these opinions, or any statements based on these opinions.

**DONE**, this 11th  day of August, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge